AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

**FILED**
NOV 18 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One (1) White and Silver Apple I-Phone Cellular Telephone
FPF No: 2019250400194201, Line Item 0003

) Case No.
)
)
)   '19 MJ 5146
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 952, 960 and 963 | Importation of Methamphetamine |
| | Conspiracy to Import Methamphetamine |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Seidy Gaytan, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/18/19

_____
Judge's signature

City and state: San Diego, CA         Hon. Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Seidy Gaytan, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports applications for warrants to search the following electronic device, as further described in Attachment A (the "**Target Device**"), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B:

> One (1) White and Silver Apple I-Phone Cellular Telephone
> FPF No: 2019250400194201, Line Item 0003
> (the "**Target Device**")

2. The requested warrant relates to the investigation and prosecution of Jorge MARTINEZ Romero ("Defendant") for importing approximately 25.50 kilograms (56.22 pounds) of methamphetamine from Mexico into the United States. *See U.S. v. Jorge Martinez Romero*, Case No. 19-CR-3265P-JM (S.D. Cal.) at ECF No. 1 (Complaint). The **Target Device** has been in the possession of DHS and securely stored since it was seized from Defendant and is presently stored at 2255 Niels Bohr Court, San Diego, California 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I submit that there is probable cause to believe that a search of the **Target Device** will produce evidence of one or more of the aforementioned crimes, as more particularly described in Attachment B.

4. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

1

## BACKGROUND

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I also am authorized to investigate violations of laws of the United States.

6. I am a Special Agent with HSI, which is a component agency of DHS and have been so employed since September 2007. I am currently assigned to the HSI San Diego field office in San Diego, California. My job duties are to investigate smuggling of controlled substances into the U.S. I have been cross-designated by the U.S. Drug Enforcement Administration (DEA) to conduct narcotics investigations and enforce provisions of the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code. Prior to my career in law enforcement, I received a Bachelor of Arts degree from the University of California San Diego, in La Jolla, California.

7. As an HSI Special Agent, my formal training consisted of six months of residential instruction at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training related to narcotics and dangerous drugs. I have participated in training programs related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, and heroin. I have also received training in the methods used by narcotics traffickers to import, distribute, package and conceal controlled substances. Moreover, I have participated in over 75 investigations and executed arrests for drug related offenses, including possession with the intent to distribute, transportation, and the importation of controlled substances.

8. Based on my training and experience, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties I have (1) worked as a case agent, directing specific drug-related investigations; (2) worked

as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (3) participated in the execution of search warrants related to drug investigations; (4) initiated and executed arrests for drug-related offenses, including possession with the intent to distribute; and (5) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances. Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

9. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations, including the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

10. Investigations of the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice and text messages referring to the arrangements of travel and payment, names, photographs, and phone numbers of co-conspirators. For example, based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

      b.     Drug traffickers and their accomplices often will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

      c.     Drug traffickers and their accomplices often will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

      d.     Drug traffickers often will use cellular/mobile telephones to communicate with drivers, including to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

      e.     Drug traffickers often will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

      f.     Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

      g.     The use of cellular telephones by drug traffickers and their accomplices tends to generate evidence that is stored on the cellular telephones, including but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

4

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the target devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

14. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use).

Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

15. Furthermore, based on my training and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS SUPPORTING PROBABLE CAUSE

16. On July 30, 2019, at approximately 6:30 PM, MARTINEZ, a United States citizen, applied for entry into the United States from Mexico at the San Ysidro, California, Port of Entry in vehicle lane #16. MARTINEZ was the driver, sole occupant, and registered owner of a 2019 Toyota Corolla bearing California license plates 8LBY620 ("the Vehicle").

17. According to a report by Customs and Border Protection Officer ("CBPO") M. Perez, he received two negative Customs declarations from MARTINEZ and received MARTINEZ's valid United States passport card. CBPO Perez asked MARTINEZ to open the trunk and began a brief inspection. He pulled the right rear quarter panel carpet back and observed what appeared to be a crystal-like substance wrapped in a clear plastic

package. MARTINEZ was asked to step out of the vehicle and was escorted to the security office. The vehicle was then sent to secondary inspection for further processing.

18. According to a report by CBPO J. Stearns, he was operating the Z-Portal X-Ray machine and detected anomalies in both rear quarter panels and the rear seats of the Vehicle.

19. According to a report by Canine Enforcement Team Officer K. Smolkovich, she was conducting secondary inspection operations when she heard a call on the radio that a vehicle showed anomalies. She had her assigned Narcotic and Human Detection Dog ("NHDD") conduct a sniff of the Vehicle, at which point her NHDD alerted and indicated to a trained odor coming from the rear driver side wall of the Vehicle.

20. According to a report by CBPO A. Torres, CBPO Torres was the assigned seizing officer. After conducting a further inspection of the Vehicle, CBPO Torres discovered packages in the driver and passenger-side rear quarter panels of the Vehicle. One package from the rear driver side quarter panel was tested and tested positive for the characteristics of methamphetamine. CBPO Torres then placed MARTINEZ under arrest.

21. CBPO Torres extracted the remaining packages from the vehicle, in particular: 7 additional packages form the left quarter panel, 13 packages from the right quarter panel, and 4 packages from under the rear passenger seats of the vehicle. Together, the 25 packages weighed approximately 25.50 kilograms (56.22 pounds). CBPO Torres further seized the Vehicle, the packages of methamphetamine, and the **Target Device** that was with MARTINEZ at time of arrest.[1]

22. I was notified of the event and responded to the San Ysidro POE. Upon my arrival, I made contact with MARTINEZ and was provided with personal effects that had

---

[1] It is unclear from Officer Torres' report whether the **Target Device** was seized from the Vehicle or from MARTINEZ's person. However, based on my training and experience, I know that CBP officers collect personal items from both the Vehicle and the individual's person, place them in a secure location, and if that person is subsequently arrested, provide them to the HSI case agent when he/she arrives at the POE.

been seized from him. Among those personal effects was the **Target Device**.[2]

23. I advised MARTINEZ of his *Miranda* rights. MARTINEZ waived his rights, and I subsequently conducted a recorded interview of MARTINEZ.

24. During the post-*Miranda* interview, MARTINEZ stated that he believed he was smuggling large amounts of money, which he believed to be drug proceeds. He admitted that he knew that the organization he was working for was involved with drugs. He stated that he was going to be paid $2,500 to smuggle money from the United States to Mexico. MARTINEZ claimed a lock box was put into the vehicle engine/battery area with a GPS, but officers did not find one. MARTINEZ stated he would communicate via the Whats App application on the **Target Device**.

25. MARTINEZ stated that he had responded to a Facebook advertisement looking for drivers. MARTINEZ then met a male known as Jose Perez ("PEREZ") who told him that he was going to be crossing cash from Mexico to the U.S. Later, PEREZ told MARTINEZ that he was going to cross money from the U.S. to Mexico. MARTINEZ admitted that the day of his arrest was going to be the third time that he worked for this organization. After he met with PEREZ, MARTINEZ was put in contact with another individual, "JAIME." JAIME became the new point of contact for MARTINEZ; he would instruct MARTINEZ when he was going to work and send him the meeting locations in Tijuana and locations in Orange County. MARTINEZ described the second occasion that he had worked for JAIME, earlier that day, during which he had met with another male, Fabelo Martinez ("FABELO") at a restaurant in Orange County and turned over the Vehicle. The Vehicle was returned to MARTINEZ about four hours later, at which point FABELO told MARTINEZ that he was still waiting on the money that MARTINEZ had to transport south. MARTINEZ had to drive to a second location to wait and met with

---

[2] At the time of MARTINEZ's arrest, which was prior to the decision in *United States v. Miguel Cano*, 934 F.3d 1002 (9th Cir. 2019), I accessed and reviewed the contents of the **Target Device** pursuant to what I believed was legal border search authority. I have not included any of that information herein and submit that there is independent probable cause justifying issuance of the requested warrant to search the **Target Device**.

8

other individuals there; ultimately, the money was placed behind the passenger side seat in the Vehicle, and MARTINEZ drove the Vehicle back to Tijuana. In Tijuana, another male took his car and returned it about 45 minutes later. MARTINEZ stated he was then asked to work again, and he agreed. MARTINEZ stated he was supposed to pick up money the following day (7/31/2019) and was headed back home that night.

26.   Given the facts surrounding MARTINEZ arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that MARTINEZ used the **Target Device** to further his drug smuggling activity, and that because the **Target Device** has been securely stored since it was seized, information relevant to MARTINEZ's drug smuggling activity continues to exist on the **Target Device**. Such evidence could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data.

27.   I also know that drug trafficking conspiracies require intricate planning and coordination to successfully evade detection. Based upon my professional training and conversations with other law enforcement officers, this planning and coordination often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Additionally, co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of valuable cargo, particularly in the hours following the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Device** is from May 2, 2019, up to and including July 31, 2019, which was the day following MARTINEZ's arrest.

## METHODOLOGY

28.   It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular/mobile

devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

# CONCLUSION

31. Based on all the facts and circumstances described above, there is probable cause to conclude that MARTINEZ used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

32. Because the **Target Device** was promptly seized during the investigation of MARTINEZ's trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by MARTINEZ continues to exist on the **Target Device**.

33. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the **Target Device** described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Seidy Gaytan
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this _18_ day of November, 2019.

_____
The Honorable Bernard G. Skomal
United States Magistrate Judge

11

## **ATTACHMENT A**
PROPERTY TO BE SEARCHED

The following property is to be searched:

>One (1) White and Silver Apple I-Phone Cellular Telephone
>FPF No: 2019250400194201, Line Item 0003
>(the "**Target Device**")

The **Target Device** is currently in the possession of the Department of Homeland Security at 2255 Niels Bohr Court, San Diego, California 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 2, 2019, up to and including July 31, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**